Kevin D. Neal (Bar No. 011640)
William F. King (Bar No. 023941)
Kenneth N. Ralston (Bar No. 034022)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
kevin.neal@gknet.com
bill.king@gknet.com
kenneth.ralston@gknet.com

*Attorneys for the Plaintiffs*

*(Additional Counsel Listed on Signature Page)*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dianna Williams and Alicia Bell, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BANNER HEALTH and META PLATFORMS, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Dianna Williams and Alicia Bell ("Plaintiffs"), individually on behalf of themselves and on behalf of all others similarly situated, by and through their undersigned counsel, brings this Class Action Complaint against Defendants Banner Health ("Healthcare Defendant" or "Banner") and Meta Platforms, Inc. ("Facebook") (collectively "Defendants). The allegations of this Complaint are based upon the personal knowledge of

Plaintiffs, and on information and belief as to all other matters through investigation of Plaintiffs' counsel.

## **NATURE OF THE ACTION**

1.      This putative class action is brought on behalf of all persons, users, prospective patients and current patients who visited the Healthcare Defendant's website at https://www.bannerhealth.com  (hereinafter the "Website") and utilized the Website for its various intended purposes, and who unwittingly and without their consent had their private health conditions, identities, actual or potential medical treatments they sought, and the hospitals they visited or may visit disclosed to Facebook (hereinafter, "PII User").

2.      Plaintiffs and other Class Members seek damages associated with Healthcare Defendant's violation of their privacy rights under the Federal Wiretap Act 18 U.S.C. § 2510, *et. seq.* (the "Wiretap Act"), Arizona Consumer Fraud Act A.R.S. §§ 44-1521 *et seq.*, and ancillary common law claims for invasion of privacy and intrusion upon seclusion.

3.      Healthcare Defendant's "Notice of Privacy Practices" informs PII Users that it is "committed to protecting the confidentiality of information about you and is required by law to do so."[1] The Notice of Privacy Practices also describes how Healthcare Defendant may use and disclose information about PII Users to others outside Banner, however, none of these reasons state that Banner Health will disclose PHI to Facebook for Facebook's own use and monetary gain.[2]

---

[1] *Privacy Practices for Banner Health*, BANNER HEALTH https://www.bannerhealth.com/patients/patient-resources/privacy (last visited June 30, 2023).
[2] *Notice of Privacy Practices (HIPAA) Fact Sheet*, BANNER HEALTH https://www.bannerhealth.com/-/media/files/project/bh/patients-visitors/privacy-practices/hipaa-eng-fs-03-28-19.ashx (last visited June 30, 2023).

4.      Since its creation in 2004, Facebook has evolved into a social media giant, which has allowed it to take advantage of its massive audience to become one of the largest advertising companies in the world.[3]

5.      In order to optimize its advertising business, Facebook collects data regarding users' interactions with websites across the internet. One of the ways Facebook collects this user data is through the use of the "Facebook Pixel."

6.      The Facebook Pixel is snippet of computer code that Healthcare Defendant places on its Website and, when called by a user loading Healthcare Defendant's Website, allows Healthcare Defendant to collect the PHI of its users and share it with Facebook.[4] More specifically, Healthcare Defendant tracks users' activities on its website by utilizing the Facebook Pixel, which is used to intercept the PHI of users, such as the search terms used by a PII User, what health condition the user is searching for information regarding or assessing, and other information related to the user's use of the Website, along with the user's Facebook ID ("FID"). The users' PHI and FID are packaged together and then sent via a single data transmission to Facebook, enabling Facebook to identify users and associate users' profiles to users' PHI. This occurs even when the PII User has not consented or authorized the Healthcare Defendant to share such information.

7.       The Website was coded to include the Facebook Pixel code, which Healthcare Defendant has allowed to operate on its Website, and results in Healthcare Defendant sharing users' PHI with Facebook. The Facebook Pixel code monitors for events ("Pixel Events") specified by the Healthcare Defendant and sends users' FID and PHI to Facebook whenever one of these Pixel Events occurs on the Website.

---

[3] Facebook Ad Revenue (2017-2026), OBERLO https://www.oberlo.com/statistics/facebook-ad-revenue (last visited June 30, 2023).
[4] *Meta Pixel for Developers: Meta Pixel*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/ (last visited June 30, 2023).

8.      In this case, Healthcare Defendant's data sharing is automatically triggered when a user visits the Healthcare Defendant's Website, which have PageView, Microdata, and SubscribedButtonClick Pixel Events active across various webpages. As detailed more fully below, these Pixel Events triggers when a user uses the health assessment portion of the Website, searches for information related to a health condition on the Website, or when a user searches for a hospital to find a doctor on the Website. When a user of the Website performs any one of these actions and has previously or is currently signed into Facebook using the same browser used to access the Website, the Website triggers one or several of the Pixel Events set by the website owner, resulting int the user's PHI being automatically shared with Facebook.

9.      Defendant shares the PII—i.e., the users' unique FID and PHI—as one data point to Facebook. Because the user's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily identify the account holder and view that user's corresponding Facebook profile. Put simply, the Facebook Pixel allows Facebook to know the health conditions that users researched on the Website, the location and type of doctor users searched for, and what type of health information users searched for on the Healthcare Defendant's Website.

10.      The Website's users are not informed about the dissemination of their PHI. Healthcare Defendant's Website users are not given an opportunity to consent to the dissemination of their PHI; instead, it is automatic. PII Users cannot exercise reasonable judgment to defend themselves against the methods used by Healthcare Defendant to collect and use their PHI.

11.      Incorporation of the Facebook Pixel onto a website provides numerous benefits to the website incorporating the Pixel, allowing the website owner to analyze website user experiences and behavior to assess the website's traffic and functionality. Use of the Facebook Pixel also allows the website owner or operator to target or retarget their

site users with advertisements, along with measuring how well those advertisements are working.

12.     Facebook also benefits directly from third-party websites that implement the Facebook Pixel. When placed on a third-party site, the Facebook Pixel allows Facebook to surreptitiously gather information regarding all the user's interactions with the website. Facebook then aggregates the data it collects across all the websites that implement the Pixel.[5] By collecting this user information, Facebook is able to improve its machine-learning algorithm to better identify and target users across the web, improving the effectiveness of its advertising services, ultimately making Facebook more marketable as an advertising broker.

13.     This makes the Pixel's integration into healthcare websites, such as Healthcare Defendant's, that serve as repositories for confidential medical data, even more concerning. To underscore the scope of the Pixel's reach, the Pixel is included on 33 out of the leading 100 hospitals' websites in the United States.

14.     As detailed more fully below, a user of the Healthcare Defendant's Website that inputs information into the Website to assesses a health condition or search for symptoms related to their health condition has that information transmitted to Facebook through the Pixel, which often includes explicit details regarding that user's potential medical condition.

15.     The information transmitted through the Pixel may include health conditions (e.g. cancer or pregnancy), information regarding medications, allergies, among other

---

[5] *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on June 30, 2023); and *Meta Business Help Center: Metrics and estimates using Accounts Center accounts*, FACEBOOK https://www.facebook.com/business/help/283579896000936 (last visited on June 30, 2023).

forms of PHI which can all then be used by Facebook to better target users with advertisements.

16.     Healthcare Defendant's tracking, sharing, interception, and storage of information – directly, and as aider and abettor to Facebook's interception – violates Plaintiffs' and Class Members' statutorily-protected privacy in their protected health information, including their current or potential medical conditions, the effect those medical conditions have on their lives, the symptoms of those medical conditions, and health concerns that person may be experiencing, tied to their personally identifiable information (hereinafter, "PHI").

17.     Through enactment of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996), and regulations codified by the United States Department of Health and Services ("HHS"), national standards were established to protect the confidential health information of patients across the United States. [6]

18.     By visiting the Website, Plaintiffs and Class Members entrusted Healthcare Defendant with their PHI. Plaintiffs and Class Members had a reasonable expectation that their PHI would be kept safe from unauthorized disclosure.

19.     In violation of that trust, Healthcare Defendant disclosed Plaintiffs' and Class Members' PHI with Facebook without authorization or consent to further Healthcare Defendant's own commercial interests. Healthcare Defendant has thus failed to safeguard

---

[6] HIPPA defines personal health information as individually identifiable health information that is transmitted or maintained in any form or medium (electronic, oral, or paper) by a covered entity or its business associates, excluding certain educational and employment records. "Individually identifiable health information" is information, including demographic data, that relates to: (1)the individual's past, present or future physical or mental health or condition, (2) the provision of health care to the individual, or (3) the past, present, or future payment for the provision of health care to the individual; and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual. Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, Social Security Number)

6

Plaintiffs' and Class Members' sensitive personal, including health, information in violation of federal and state law.

20. Defendants have each profited from the unauthorized disclosure of Plaintiffs' and Class Members' PHI as explained below. The collection of such data additionally allowed pharmaceutical and other related companies to send targeted advertising to Plaintiffs and Class Members based on their PHI.

21. Due to Facebook's unlawful data collection practices, Plaintiffs were subjected to personalized advertisements based on their PHI, which included sensitive PHI they had provided to the Website.

22. As part of Facebook's advertising operations, Facebook customizes and directs these advertisements specifically toward Plaintiffs and Class Members. Facebook thus profits by granting third-parties access to individuals who are highly likely to be interested in their products or services, commonly referred to as a target audience.

23. Despite Facebook's knowledge that the Pixel unlawfully collects highly sensitive PHI on the Website without Plaintiffs' permission, Facebook continues to collect and profit from the information collected.

24. Moreover, Healthcare Defendant had knowledge that implementing the Pixel on its Website would cause the collection and sharing of Plaintiffs' and Class Members' sensitive PHI.

25. Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs and Class Members seek relief in this action individually and on behalf of users of the Website for violations of their right to privacy and for violations of various federal and state law.

**THE PARTIES**

**A.    Plaintiffs**

26.    Plaintiff Dianna Williams is a resident of Washington. In or around 2021, Ms. Williams began visiting the Website. Plaintiff has a Facebook account and has been a user of Facebook since 2009 Plaintiff has been using the Website since 2021 to search for medical information related to her health conditions, to assess her joint pain through the Website's joint pain assessment, and to assess her health needs and access other information related to her health conditions. Ms. Williams similarly used the Website's search function to search for information related to healthy living and living with diabetes. Ms. Williams was encouraged to utilize the Website for these functions as one of the first results that popped up when Ms. Williams searched for "health assessments" online was the Website's health assessment function. Ms. William's Facebook profile contains information like her name, occupation, place of residence, and other personal information.

27.    After utilizing the Website to search for information related to her health condition, Ms. Williams received various targeted advertisements on her Facebook page related to her use of the Website.

28.    Plaintiff Alicia Bell is a resident of Arizona. In or around 2021, Ms. Bell began visiting the Website. Plaintiff has a Facebook account and has been a user of Facebook since July 24, 2007. Plaintiff has been using the Website for the last two years to search for medical information related to her health conditions, symptoms she was experiencing, and to find hospital locations and doctors to treat her health conditions. Ms. Bell was signed into Facebook on a computer or other device  she used to use the Website in the above described ways. Ms. Bell's Facebook profile contains information like her name, occupation, place of residence, and other personal information.

8

29.     After utilizing the Website to search for information related to her health condition, Ms. Williams received various targeted advertisements on her Facebook page related to her use of the Website.

**B.     Defendants**

25.     Defendant Banner Health is a non-profit health system company with headquarters at 2901 N. Central Ave Ste 160, Phoenix, AZ. Banner Health encourages its thousands of PII Users and prospective PII Users to utilize the Website to search for information related to their health conditions, assess health conditions, and search for hospital locations and doctors.

26.     Defendant Meta Platforms, Inc., f/k/a/ Facebook, Inc. is a Delaware corporation with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025.

## JURISDICTION AND VENUE

27.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of either Defendant.

28.     This Court has personal jurisdiction over Defendant Facebook because Facebook conducts substantial business in Arizona, and thus has sufficient minimum contacts to satisfy the requirements of personal jurisdiction.

29.     This Court has personal jurisdiction over Healthcare Defendant Banner Health as Banner Health's principal place of business is in the state of Arizona.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in and are subject to personal jurisdiction in this District. Venue is

also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## COMMON FACTUAL ALLEGATIONS

**A.    Background to the Federal Wiretap Act**

31.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[7]

32.    The Wiretap Act was primarily concerned with government's use of wiretaps, but was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[8]

33.    Congress was concerned that technological advancements were rendering the Wiretap Act out-of-date, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[9]

34.    As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications such as email between users; and (ii) remote computing services such as cloud storage or third party processing of data and files.[10]

---

[7] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited June 30, 2023).
[8] *Id.* at 192.
[9] Senate Rep. No. 99-541, at 2 (1986).
[10] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

35.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

36.    While communicating with Healthcare Defendant, users had the contents of their communications shared with Facebook.

37.    The Healthcare Defendant purposefully disclosed Plaintiffs' communications to Facebook to improve the effectiveness of their advertising and marketing or to place-third party ads on the Website.

38.    Plaintiffs did not know of or consent to the dissemination of their communications to Facebook.

39.    Facebook was not a party to the communications, as Plaintiffs did not know of their involvement in the communications, and Facebook used the intercepted communications for their benefit outside of the Healthcare Defendant's Website.

40.    The purpose of Facebook's collection of these communications was to store and collect Plaintiffs' health information.

**B.  Facebook's Advertising Business and the Facebook Pixel**

41.    Facebook was founded in 2004 by Mark Zuckerberg, Eduardo Saverin, Dustin Moskovitz, and Chris Hughes. Facebook began as a social networking website for college students,[11] and quickly saw success gaining more than one million users in 2004, and more than six million by 2005.

---

[11] Jay Fuchs, *How Facebook Ads Have Evolved [+What This Means for Marketers]*, HUBSPOT (May 18, 2023), https://blog.hubspot.com/marketing/history-facebook-adtips-slideshare (last visited June 30, 2023).

42.     By 2008, Facebook's popularity surpassed Myspace, and making it the leading social networking platform. [12]

43.     Recognizing the significance of having direct connection to millions of consumers, Facebook initiated the monetization of its platform in 2007 through the introduction of "Facebook Ads."[13] This new advertising approach was promoted a "completely new way of advertising online" that would enable advertisers to deliver more personalized and pertinent advertisements.[14]

44.     At present, Facebook offers advertising services on its own platforms, including Facebook and Instagram, in addition to external websites through the Facebook Audience Network.[15] Facebook now has over 2.9 billion active users and has extensive advertising reach[16]

45.     Facebook provides various advertising targeting options which cater to an advertiser's desired audience. These options include "Core Audiences," "Custom Audiences," "Look Alike Audiences,"[17] and a more detailed targeting approach known as "Detailed Targeting." Each of these advertising tools enables advertisers to focus on specific users based on their personal data, which includes factors such as geographic

---

[12] Michael Arrington, *Facebook No Longer The Second Largest Social Network,* TECHCRUNCH https://techcrunch.com/2008/06/12/facebook-no-longer-the-second-largest-social-network/  (last visited June 30, 2023).)

[13] *Facebook Unveils Facebook Ads*, FACEBOOK https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/ (last visited June 30, 2023).

[14] *Id.*

[15] *Business Center Help: About Meta Audience Network*, FACEBOOK https://www.facebook.com/business/help/788333711222886?id=571563249872422 (last visited June 30, 2023).

[16] *Id.*

[17] *Target Audiences: Hitting The Bullseye With Facebook Ads*, SPRAGUEMEDIA https://spraguemedia.com/blog/target-audiences-bulleye-with-facebook-ads/ (last visited June 30, 2023).

location, demographics, interests, connections, and behaviors among other criteria.[18] The creation of such audiences can be done by Facebook, the advertiser, or a combination of both.

46.     Based on Facebook's ability to target specific users so precisely, it is unsurprising that Facebook's advertising service swiftly emerged as the most prosperous business division within Facebook. Millions of companies and individuals avail themselves of Facebook's advertising offerings.

47.     In 2009, Meta generated $761 million in revenue through its advertising operations. A mere decade later, the Facebook's advertising revenue skyrocketed, experiencing an exponential growth of almost 100 times.[19]

48.     As shown below, Facebook generates essentially all of its revenue from selling advertising placements to marketers.

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |
| 2017 | $40.65 billion | $39.94 billion | 98.25% |

49.     Indeed, their advertising revenues have continued to grow: a recent report indicates that Facebook's revenues from advertising alone are set to hit $153.76 billion in 2023, representing a 13.1% increase from 2022.[20]

---

[18] *Id.*

[19] Rishi Iyengar, *Here's how big Facebook's ad business really is*, CNN BUSINESS (July 1, 2020) https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited June 30, 2023).

[20] Facebook Ad Revenue (2017-2026), OBERLO https://www.oberlo.com/statistics/facebook-ad-revenue (last visited June 30, 2023).

50.    Facebook's ad-targeting capabilities have faced consistent scrutiny due to its capacity to target individuals using highly detailed data. For example, Meta reached a settlement with the Department of Justice regarding its Lookalike Ad service in 2022. The Lookalike Ad service allowed discriminatory targeting by landlords based on race and other demographic factors, resulting in a violation of federal law.

**C.  Facebook's Introduction of the Facebook Pixel**

51.    According to Peter Eckersley, the Chief Computer Scientist at the Electronic Frontier Foundation, Facebook's tracking tools enable Facebook to gather extensive information about individuals, and with the help of artificial intelligence, analyze the behavior of those individuals.[21] The comprehensive knowledge resulting from implementation of its tracking tools is ideal for advertising purposes, allowing for highly targeted and effective targeted advertising campaigns.

52.    Facebook employs diverse tracking methods to gather data about individuals, which includes incorporating software development kits into third-party applications[22], utilizing "Like" and "Share" buttons (referred to as "social plug-ins"), and employing various other methodologies.[23] This accumulated data is subsequently leveraged to enhance Facebook's advertising business. One of the most notable tools in Facebook's tracking

---

[21] Sam Harnett, *Here's the Data Facebook Has on Users and How the Company Gathers It*, KQED (Mar. 22, 2018)  https://www.kqed.org/news/11657315/heres-the-data-facebook-has-on-users-and-how-the-company-gathers-it (last visited June 30, 2023).
[22] *How Facebook tracks you on Android (even if you don't have a Facebook account)*, MEDIUM (Nov. 11, 2019) https://medium.com/codomo/how-facebook-tracks-you-on-android-even-if-you-dont-have-a-facebook-account-92613e0c017a (last visited June 30, 2019).
[23] *Meta for Developers: Social Plugins*, FACEBOOK https://developers.facebook.com/docs/plugins/ (last visited June 30, 2023).

arsenal is the Meta Pixel or Facebook Pixel (the "Facebook Pixel" or "Pixel"), which was introduced in 2015 and holds significant influence as described below.[24]

53.     Facebook promotes the Pixel as an innovative solution for reporting and optimizing conversions (clicks to purchases), audience building, and gaining valuable insights into website usage. Facebook emphasized that website owners could easily utilize the Pixel by embedding an image that occupies a single pixel on a webpage, enabling them to track and optimize conversions. This feature allows website owners and advertisers to gauge the effectiveness of their advertising efforts by monitoring the actions taken by individuals on their website.

54.     For Facebook, the Pixel serves as a channel for collecting and transmitting information collected by websites utilizing the Pixel to Facebook. This information is relayed through scripts on the website, executed within the user's internet browser.

55.     Facebook also has the ability to connect the data with a user's Facebook account using the "Facebook Cookie." This cookie serves as a solution to counteract cookie-blocking methods, including one created by Apple, Inc., that aim to monitor user activities.[25] Cookies, or small data files placed on a user's PC while using a website, are often used as a means to store information about a user's identity or activity on websites. While companies like Apple, Inc. try to limit cookie functionality, Facebook has developed a first-party cookie that serves as a solution to counteract cookie-blocking methods, such as Apples.[26]

---

[24] Cecile Ho, *Announcing Facebook Pixel*, FACEBOOK (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited June 30, 2023).
[25] *What Facebook's First-Party Cookie Means for AdTech*, CLEARCODE, https://clearcode.cc/blog/facebook-first-party-cookieadtech/#facebook-cookie-pixel:-from-third--to-first-party (last visited June 30, 2023).
[26] *Id.*

56.     A function of the Pixel is to gather, collect, and then share user information with Facebook.[27] This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[28]

57.     The surreptitious communications described above happen without the users' knowledge.

58.     Once installed, the Pixel provides website owners with data and analytics tools about ads which they have placed on Facebook and the various tools being used to target people who have visited their website.[29]

59.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

60.     The information collected by the Pixel is sent to Facebook with PII, which includes the user's IP address, name, email, phones number, and specific Facebook ID that points to the user's Facebook profile. This PII is stored across a number of cookies and by Facebook on its servers, which it maintains for years in some cases.[30]

---

[27] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited on April 2, 2023).

[28] *See Meta Pixel*, FACEBOOK, *available at* https://www.facebook.com/business/tools/meta-pixel (last visited on April 2, 2023).

[29] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, and Surya Mattu, *Facebook Is Receiving Sensitive Medical Information form Hospital Websites*, THE MARKUP (Jun. 16, 2022) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited June 30, 2023).

[30] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, and Surya Mattu, *Facebook Is Receiving Sensitive Medical Information form Hospital Websites*, THE MARKUP (Jun. 16, 2022) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited June 30, 2023).

16

61.    Despite claiming to "hash" personally identifiable information (PII) provided by PII User, Facebook actually utilizes the hashed format with the specific intention of linking Facebook Pixel data to Facebook profiles. Facebook has engineered the Pixel in a way that allows it to receive real-time information about PII User's actions on the medical provider's online platforms. Whenever a PII User performs any action on a webpage that includes the Facebook Pixel, such as clicking buttons for registration, login, logout, or appointment creation on a PII User portal, the embedded Facebook code intercepts the content of the PII User's interaction to Facebook while the communication between the PII User and the medical provider is still ongoing.

62.    Between the 33 top 100 hospitals that were discovered to have the Facebook Pixel report on by the Markup article, which similarly collect and transmit PII User appointment information to Facebook, these hospitals together reported over 26 million PII User admissions and out PII User visits in the year 2020 alone. The total number of affected PII Users will inevitably trend higher as The Markup's investigation was limited to slightly over 100 hospitals.

63.    One legal officer at Privacy International, Laura Lazaro Cabrera, highlighted that even having access to a portion of these data points, such as solely the URLs accessed by users, poses concerns regarding Facebook's usage. In reasoning, Cabrera emphasized that users should: "'[t]hink about what you can learn from a URL that says something about scheduling an abortion' . . . 'Facebook is in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data.'"[31]

64.    In a recent development, employees at Facebook acknowledged the insufficient safeguards in place for protecting sensitive data. Engineers working on the ad

---

[31] Grace Oldham and Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would- Be Patients*, THE MARKUP (Jun. 15, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients (last visited June 30, 2023).

and business product team at Facebook expressed in a privacy overview from 2021 that they lack the necessary level of control and transparency regarding the utilization of data within their systems during a privacy overview in 2021.[32] As a result, they are unable to make well-informed policy changes or external commitments, such as stating with confidence that they will not use specific data for certain purposes.

65.     Website owners – such as Defendant Banner Health – holds the decision-making authority over the placement of the Pixel on their websites. The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the functionality of its website made available to visitors, or what is gathered about its user and then shared with third parties.

### a.     *Healthcare Defendant added the Pixel to the Banner Health Website*

66.     To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[33] For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees),

---

[32] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE (Apr. 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-orwhere-it-goes (last visited June 30, 2023).

[33] *How to create a Meta Pixel in Business Manager*, FACEBOOK, *available at* https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited June 30, 2023).

(iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[34]

67.     The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site. The process begins with the website operators naming the Pixel at the time of its creation.[35]

68.     Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,[36] as well as connect the Pixel to a Facebook Ad account.[37]

69.     To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

70.     Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv)

---

[34] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL, *available at* https://sproutsocial.com/insights/facebook-business-manager/ (last visited June 30, 2023).

[35] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited June 30, 2023).

[36] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited June 30, 2023).

[37] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited June 30, 2023).

adding event code using an automated tool or manually,[38] (v) domain verification, and (vi) configuring web events.[39]

71.   After following these steps, a website operator can start harvesting information using the Pixel.

72.   A Pixel cannot be placed on a website by a third-party without being given access by the site's owner. There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

73.   When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[40]

74.   A Facebook UID can be used, by anyone, to easily identify a Facebook user. Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

---

[38] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually. *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited June 30, 2023).

[39] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited June 30, 2023); *see* Ivan Mana, How to Set Up & Install the Facebook Pixel (in 2022), YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited June 30, 2023).

[40] *Privacy Center: Cookies & other storage technologies*, FACEBOOK, https://www.facebook.com/policy/cookies/ (last visited June 30, 2023).

75.     In addition to the c_user cookie, the Facebook Pixel also transmits personally identifying information connected with a PII User's in the form of cookie identifiers, including IP address, browser fingerprints and device identifiers.

76.     An IP (Internet Protocol) address is "a unique address that identifies a device on the internet or a local networks."[41] Essentially, an IP addresses is:

> the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

77.     Browser-fingerprints is "information collected about a remote computing device for the purpose of identification."[42] Browser fingerprints include information such as "operating system, active plugins, time zone, language, screen resolution, and various other active settings."[43] A study in 2017 demonstrated that browser fingerprinting techniques can be used to successfully identify 99.24 percent of all users.[44]

---

[41] *What is an IP Address – Definition and Explanation*, KASPERSKY https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited June 30, 2023).
[42] *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXELPRIVACY https://pixelprivacy.com/resources/browser-fingerprinting/ (last visited June 20, 2023).
[43] *Id.*
[44] Yinzhi Cao, Song Li, and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, NDSS (Feb. 27, 2017) https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/ (last visited June 30, 2023).

### b.    The Pixel as a Tracking Method

78.    The Pixel tracks user-activity on web pages by monitoring events which,[45] when triggered, causes the Pixel to automatically send data directly to Facebook.[46]

79.    Examples of events utilized by websites are: (i) "microdata" tags (the "Microdata event"),[47] (ii) visiting webpages with a Pixel installed (the "PageView event")[48] and a button click on a webpage ("SubscribedButtonClick"). The Healthcare Defendant's Website utilized all three of these Pixel events.[49]

80.    When a PageView event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[50] This confirms that the Pixel events sent data to Facebook.

81.    The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie. It may also include information in its Payload, such as metadata tags.

---

[45] *Meta Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited June 30, 2023).
[46] *See generally Id.*
[47] *Facebook Microdata Installing Schema*, CAT HOWELL, https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited June 30, 2023).
[48] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited June 30, 2023).
[49] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited June 30, 2023).
[50] *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited June 30, 2023).

22

82.     A Request URL, in addition to a domain name and path, typically contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[51]*

83.     PII Users experienced the detrimental consequences of Facebook's illicit gathering and dissemination of their PHI. Plaintiffs, as a user of the Website had their sensitive personal health information shared with Facebook, without their consent.

84.     To demonstrate the Pixel's operation on the Website, a user visiting the Website to assess their joint pain, is asked to provide a variety of details to help in the assessment of their join pain, including their name, age, email, ethnicity, weekly activity level, whether the they have a primary care physician, which joint they would like to assess, level of pain, and other details to help in assessing their health condition:

---

[51] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited June 30, 2023).



*The Website's Joint Health Assessment, Page 2*



*The Website's Joint Health Assessment, Page 5*

*The Website's Joint Health Assessment, Page 8*

85.     Once the user has reached the end of the assessment, the Website asks the user for their name, phone number, and zip code, along with a checkbox that would allow the user to schedule an appointment with a Banner Health facility based on their assessment. This demonstrates that the health assessment portion of the Website is used as a PII User recruitment tool for prospective PII Users.

25



*The Website's Joint Health Assessment, Last Page*

86.     A PII User that clicks through the assessment has all their interactions with the Website disclosed to Facebook, with information including their level of pain, which joint is experiencing pain, how that pain is impacting their daily life, and other intimate details that are typically reserved for healthcare providers. Healthcare Defendant discloses this information along with the PII User's unique Facebook ID, which is captured by the c_user cookie as shown below. This allows Facebook to link the PII User's protected PHI with the user's unique FID, enabling them to identify that PII User.

87.     Upon clicking "Next" button to navigate through the health assessment, the SubscribedButtonClick Pixel Event is triggered as demonstrated below in Figure 2, showing the Pixel's transmission of the PII User's PHI to Facebook:



*Figure 2: The SubscribedButtonClick Events Transmission of PHI to Facebook on the Health Assessment portion of the Website*

88.     The above representation of data transmission is consistent across all pages of the Healthcare Defendant's various health assessments.

89.     Additionally, Healthcare Defendant discloses other PII to Facebook in the form of the user's IP address, cookie identifiers, browser-fingerprints, and device identifiers.

90.     Healthcare Defendant allows PII Users to search for information related to medical care, including conditions like "Cancer," "Arthritis," and "Pregnancy Care."

Unknown to a user utilizing the Website to search for information about cancer or pregnancy, that user not only shares their PHI with Facebook, but also shares their PII through the Pixel's transmission of the user's FID associated with that user's activity.



*Screenshot of User's Search Results on the Website, and Recommended Services Associated with that User's Search*

91.     The above representation of data transmission is consistent across all searches conducted through the Healthcare Defendant's Website.

92.     As evident from the search results displayed above, the information a user reviews on the Website can reveal extremely personal health information about that individual. By conducting a simple search for pregnancy on the Website, the user tells Facebook that the PII User is likely pregnant. This process results in Facebook obtaining knowledge that the PII User is potentially pregnant, with no input from the PII User. Nothing on the Website indicates to PII Users that utilizing the Website's search function will reveal their PII along with the exact content of their communications with the Website. This process is automatic, surreptitiously collecting and transmitting users PII and PHI to Facebook for advertising purposes. Upon clicking "Search" to search the Website for information related to their PHI, the PageView Pixel Event is triggered as demonstrated below in *Figure 3*, showing the Pixel's transmission of the PII User's PHI to Facebook:



*Figure 3: The PageView Events Transmission of PHI to Facebook on the search function portion of the Website*

93.    Similarly, clicking the "Search" button also triggers the SubscribedButtonClick Pixel Event, resulting in the PII User's PHI, in the form of whatever condition the PII User searched for information regarding, being transmitted to Facebook via www.facebook.com/tr/, as depicted below in *Figure 4*:



*Figure 4: The SubscribedButtonClick Events Transmission of PHI to Facebook on the Search portion of the Website*

94.    The above representation of data transmission is consistent across all searches conducted through the Healthcare Defendant's search bar.

95.    Finally, the MicroData event triggers whenever a webpage containing metadata tags established by Discovery is loaded onto the user's browser.[52] In this case, the search results pages on the Website contain MicroData tags, which result in the transmission of PII User's PHI to Facebook, as shown below in *Figure 5*:

---

[52] *What are the Subscribedbuttonclick and MicroData events and can/should I disable this?*, FARMER'S RANDOM WEB/AD TECH PROBLEMS, Dec. 28, 2017, http://randomproblems.com/subscribedbuttonclick-microdata-events-can-disable-facebook-pixel-autoconfig-feature/ (last visited June 30, 2023).



*Figure 5: The MicroData Pixel Events Transmission of PHI to Facebook on the Health Assessment portion of the Website*

96.     The above representations of data transmission are consistent across all searches conducted through the Healthcare Defendant's Website. The search results also include Banner Health facility locations where that PII User may seek treatment for their health condition. Additionally, the search results have links to services offered by Banner Health related to that PII User's health condition, which when clicked, similar to the health assessment data transmitted, cause disclosure of that PII User's PHI to Facebook.

97.     The data disclosed by Healthcare Defendant includes prospective and actual PII User information from other sections of the Website, which include communications collected when a PII User searches for services or classes offered by Healthcare Defendant, and communications that are transmitted when a user is assessing a health condition on the Website. As a result of this process, Facebook receives information from Healthcare Defendant which also includes a full-string, detailed, which includes the name of the website, the pages the PII Users are viewing, and search terms entered by the PII User. Healthcare Defendant additionally caused the transmission of PII User's cookie identifiers, including IP address, browser fingerprints and device identifiers.

98.     By integrating their Website with code that results in the disclosure of prospective PII User's PHI and other personally identifiable information, Healthcare Defendant knowingly disclosed information that allowed Facebook and advertisers to link PII User's PHI to their identities and target them based on their personal health conditions. Thus, Healthcare Defendant intentionally shares their users PHI with Facebook in order to financially benefit from the Pixel tool.

**D.      Plaintiffs and Class Members Do Provide Authorization to Defendants to Collect and Disclose their PHI**

99.     The Healthcare Defendant does not seek nor obtain authorization from their PII Users, including Plaintiffs and the Class, to share the PII User's PHI with third-parties, including Facebook.

100.    Plaintiffs and the Class were unaware that Healthcare Defendant were actively collecting their sensitive PHI when visiting the Website, assessing their health conditions, and searching for information on the Website. The presence of the Pixel is completely inconspicuous as it is seamlessly integrated into the background of the Website's code.

101.    Whenever an individual, including Plaintiffs, creates a Facebook account, they enter into an agreement with Facebook by accepting and acknowledging the Terms, Data Policy, and Cookie Policy. This agreement is confirmed through a checkbox on the sign-up page. Both Facebook and its users are obligated to abide by these binding Terms, Data, and Cookie Policies.

102.    Facebook Data Policy explicitly states that businesses utilizing the Pixel are obligated to possess legal rights to collect, use, and share user data before sharing any data with Facebook.

103.    Nonetheless, Facebook does not verify whether the businesses utilizing the Pixel has indeed obtained the necessary consent, as outlined in their Data Policy.

104.    Instead, Facebook relies on what amount to an "honor system" approach, whereby businesses are required to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing, and usage of data through their Business Tools.

105.    The Facebook Pixel can be accessed by any business or publisher that shows interest, regardless of the nature of their business. It is worth noting that the collection of sensitive medical information belonging to the Plaintiffs contradicts the other provisions outlined in Facebook's Data Privacy policy. Specifically, Facebook claims that each of its supposed "partners" is obligated to possess lawful rights to collect, use, and share user data before providing it to Meta. However, the Healthcare Defendant do not have the legal authority to use or share the data of the Plaintiffs and the Class, as this information is protected under HIPPPA. HIPPA covers all electronically protected health information generated, received, maintained, or transmitted by a covered entity like the Healthcare Defendant. The rule explicitly prohibits the use and disclosure of protected health information to Facebook for targeted advertising purposes, as stated in 45 C.F.R. § 164.502. As a result, Facebook contracts with healthcare providers, like Healthcare Defendant, but

fails to mention or comply with state and federal law protecting sensitive health information.

**E.    Defendants Knew that the Facebook Pixel Would Include Plaintiffs' PHI and Other Sensitive Medical Information, Including their Information regarding their Health Conditions**

106.    Healthcare Defendant knew that by utilizing the Facebook Pixel on the Website, they would disclose Plaintiffs' and Class Members' sensitive PHI to Facebook.

107.    Due to the nature of how the Facebook Pixel functions, which involves sending all user website interactions to Facebook, the Healthcare Defendant was fully aware that their user's sensitive data would be transmitted to Facebook when they engaged in any form of interaction on their websites, such as looking up information related to a health condition or assessing a health condition.

108.    Facebook should have been aware that by allowing healthcare providers, including Healthcare Defendant, to implement its Facebook Pixel on to their websites, they would facilitate the gathering of sensitive PHI belonging to the PII Users of those healthcare providers. Furthermore, Facebook knew that it would receive this PHI and it would be integrated into its advertising network, making it accessible for use to improve their advertising processes.

109.    Despite Facebook spokesman Dale Hogan's claims that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools," and that their systems are "designed to filter out potentially sensitive data," those policies and procedures have not been enforced or have been completely ineffective.[53]

---

[53] Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report*, NEWSBYTES (Jun. 16,. 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (last visited June 30, 2023).

34

110.    Further to that point, a complaint by the Federal Trade Commission filed in 2021, showed that Facebook has been receiving medical information through its Business Tools for years from popular applications related to women's health, including information related to their pregnancies. The FTC further concluded that Facebook had used that sensitive information for their own research and development purposes.

111.    Around February 2021, the New York State Department of Financial Services (NYSDFS) came to a similar determination, finding that Facebook had collected sensitive data, including medical information, in violations of its own policies. NYSDFS stated that simply "[m]erely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether . . . developers are violating this rule and takes no real action against developers that do." The NYSDFS found that Facebook's "Facebook's efforts here [are] seriously lacking" and that "[u]ntil there are real ramifications for violating Facebook's policies, Facebook will not be able to effectively prohibit the sharing of sensitive user data with third-parties."

112.    The Markup article also reported that during its investigation into Facebook's "filtering" system, it failed to delete the most obvious forms of sexual health information, which included the URLs with information related to abortion, which stated "post-abortion" "i-think-im-pregnant" and "abortion-pill."

113.    Additionally, leaked documents provided to the news organization *Vice* in 2021 exposed the fact that Facebook's employees themselves recognize Facebook's inability to effectively manage the way its systems utilize data. A Facebook engineer working on the Ad and Business Product team expressed it succinctly stating that "We do not have adequate level of control and explain ability over how our systems use data, and thus we can't confidentially make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"

114.    A research director at UC Berkley in the Usable Security and Privacy Group has stated that Facebook just does not have the incentive to enforce its own privacy policies because "[t]hat costs them money to do. As long as they're not legally obligated to do so, why would they expend any resources to fix [it]?"[54]

115.    Simply put, allegations regarding unauthorized data sharing is nothing new to Facebook.

**F.    Plaintiffs and Class Members possess a Reasonable Expectation of Privacy in their PHI**

116.    There can be no dispute that Plaintiffs and Class Members have a reasonable expectation of privacy in their personal information and sensitive medical information.

117.    Specifically, PII User health information is protected under federal law by HIPPA.

118.    HIPAA establishes nationwide guidelines for protecting confidential health information. As one example, HIPPA imposes restrictions on the acceptable purposes for using health information and expressly prohibits disclosure without explicit authorization. C.F.R. § 164.502. Additionally, HIPAA mandates that entities subject to its provisions must implement suitable measures to safeguard such information. 45 C.F.R. § 164.530(c)(1).

119.    This legal framework applies to healthcare providers, and in this case, applies to Banner Health.

120.    Pursuant to HIPPAs protections applicable to Banner Health, Plaintiffs and the Class Members had a reasonable expectation of privacy in their protected health information.

---

[54] Grace Oldham and Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, REVEAL (Jun. 15, 2022) https://revealnews.org/article/facebook-data-abortion-crisis-pregnancy-center/ (last visited June 30, 2023).

121.    Studies investigating the gathering and release of individuals' sensitive medical data validate that the Defendants' act of disclosing such information from millions of users without consent infringes upon established societal norms and expectations of privacy. [55]

122.    Consumer surveys indicated that consumers are "most willing to share their health information when privacy protections are in place, with consent being the most important, followed by data deletion, regulatory oversight and data transparency ."[56]

123.    As an illustration, a recent survey conducted by Consumer Reports indicated that 92% of Americans hold the opinion that websites and internet companies should be obligated to seek consent before selling or sharing consumers' data. Similarly, the same percentage believe that these companies should be mandated to furnish consumers with a comprehensive inventory of the collected about them.[57] Additionally, another study by *Pew Research Center* concluded that approximately 79% of Americans, are concerned about how data is collected about them by companies.[58]

124.    User behavior clearly conforms to these statistics: after the introduction of a new version of the iPhone operating software, which requests explicit and affirmative

---

[55] Jessica Hagen, *Survey: Privacy protections boost consumers' willingness to share health data*, MOBIHEALTHNEWS (Mar. 7, 2023) https://www.mobihealthnews.com/news/survey-privacy-protections-boost-consumers-willingness-share-health-data (last visited June 30, 2023).

[56] *Id.*

[57] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited June 30, 2023).

[58] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar and Erica Turner, *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last visited June 30, 2023).

consent from users before permitting companies to track them, a substantial majority of worldwide users (85%) and U.S. users (94%) opted not to share their data when presented with the prompt.[59]

125.   The high level of concern regarding the sharing of medical information is exasperated by the reality that advertisers place a very high value on this type of information. Allowing advertisers to access women's sexual health information allows them to obtain information on children before they are born. One article expressed this, stating that: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[60] The article goes on to emphasize that:

> Children today are the very first generation of citizens to be datafied from before birth, and we cannot foresee — as yet — the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles.[61]

126.   Several other privacy law experts have voiced their concern regarding the sharing of users' sensitive medical information with third parties. Dena Mendelsohn, the prior Senior Policy Counsel at Consumer Reports, and current Director of Health Policy and Data Governance at Elektra Labs, has explained that the dissemination of personal health information without one's awareness could have significant consequences, such as impacting the ability to secure life insurance and influencing the cost of coverage.[62]

---

[59] Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited June 30, 2023).

[60] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER, https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/ (last visited June 30, 2023).

[61] *Id.*

[62] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28,2020), https://www.consumerreports.org/health/health-privacy/what-your-period-tracker-app-knows-about-you-a8701683935/ (last visited June 30, 2023).

Additionally, Mendelsohn stated that could lead to higher interest rates on loans and leave individuals more susceptible to workplace discrimination.[63]

127.    Without their knowledge or consent, Defendants have surreptitiously collected and shared Plaintiffs' and Class Members' personal information and personal health information, through the Facebook Pixel, in violation of their privacy interest.

## G.    The Economic Value of Plaintiffs' and Class Member's Personal Health Information

128.    Facebook's whole business is built around collecting personal data. This is unsurprising given that the "world's most valuable resource is no longer oil, but data."[64] As stated in the *Economist*, personal data is "the oil of the digital era."[65]

129.    There is a large economic market for consumers personal data within the tech industry, including the type of data collected from Plaintiffs and Class Members.

130.    A *Financial Times* article published in 2013 reported that the data-broker industry has reaped tremendous profits from trading thousands of details regarding individual's "age, gender and location" information which are sold for about "$0.50 per 1,000 people."[66]

131.    Similarly, *TechCrunch* has reported that "to obtain a list containing the names of individuals suffering from a particular disease," someone within the market

---

[63] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28,2020), https://www.consumerreports.org/health/health-privacy/what-your-period-tracker-app-knows-about-you-a8701683935/ (last visited June 30, 2023).
[64] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data (last visited June 30, 2023) (emphasis added).
[65] *Id.*
[66] Emily Steel, et al., *How much is your personal data worth?*, FINANCIAL TIMES (Jun. 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u (last visited June 30, 2023).

would have to spend about "$0.30 per name."[67] That article explained further that the value of a single user's data (in the corporate acquisition context) can range from $15 to $40 per user.[68] The article notes that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[69]

132.    An article published by the Washington Post in 2021 by the legal scholar Dina Srinivasan explained that consumers "should think of Facebook's cost as [their] data, and scrutinize the power it has to set its own price."[70] The value of this information is only increasing. Facebook's financial statements reveal that from 2013 to 2020, the value of the average American's data in the advertising context rose from $19 to $164 per year.[71]

133.    In a paper published in 2013 by the Organization for Economic Cooperation and Development ("OECD"), the OECD measured the prices that were being demanded by companies for user information, similar to that at issue here, derived from "various online data warehouses."[72] The OECD found that, at that time, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address,

---

[67] Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13,2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited June 30, 2023).

[68] *Id.*

[69] *Id.*

[70] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacymonopoly/ (last visited June 30, 2023).

[71] *Id.*

[72] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf (last visited June 30, 2023).

date of birth, social security number, credit record and military is estimated to cost USD 55."[73]

134.   The OECD has published a chart showing the various types of market prices being attained for personal data by type: this chart is shown below:[74]



**Figure 7.  Market prices for personal data by type**

(per record)

\* two different prices provided by different providers.

*Sources:* Locate Plus (address Unpublished Phone Number  Felony) Pallorium (address, past address Unpublished Phone Number Social Security Number) KnowX via Swipe Toolkit (Past address, Marriage/Divorce Bankruptcy Information Business Ownership) LexisNexis via Swipe Toolkit (Education Background Employment History Social Security Number  Felony sex offender) Experian (Credit History) Voters online.com (voter registration)

135.   Importantly, a 2021 report by Invisibly found that personal medical information is one of the most valuable pieces of information within the market for data. The report noted that "[i]t's worth acknowledging that because health care records often feature a more complete collection of the PII User's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health

[73] *Id.*
[74] *Id.* at 26.

41

care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[75]

136.   This article provided a complete breakdown of the average price per record type:

| Record Type | Average Price |
|---|---|
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

137.   Individuals can even choose to monetize their own personal data if they choose to do so.

---

[75] *Id.*

42

138.    An article published by the Verge notes that Facebook has offered individuals money for their voice recordings,[76] and has also offered teens and adults up to $20 a month plus referral fees to install software allowing Facebook to collect data on how individuals us their smartphones.[77]

139.    Additionally, various other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.[78]

**H.    Facebook's Long History of Privacy Violations**

140.    Facebook has maintained its core business model around monetizing user information since 2007 to the expense of its users. This is evident from a complaint filed by the Federal Trade Commission ("FTC") in 2019 against Facebook which noted that ""substantially all of Facebook's $55.8 billion in 2018 revenues came from advertising."[79]

141.    During its launch in 2007, Facebook introduced the "Facebook Beacon" without users being informed about the tracking of their online activities, and initially, there was no option for users to opt-out. Following widespread criticism, Facebook Beacon was eventually discontinued.

142.    Facebook reached another settlement with the FTC in November of 2011 related to their sharing of Facebook user information with advertisers. In addition, the settlement covered claims that Facebook had falsely asserted that third-party apps were

---

[76] Jay Peters, *Facebook will now pay you for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognitionviewpoints-proununciations-app (last visited June 30, 2023).

[77] Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 29. 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (last visited June 30, 2023).

[78] *26 Apps That Pay You For Data Collection: Earn a Passive Income*, DOLLARBREAK (July. 7, 2022), https://www.dollarbreak.com/apps-that-pay-you-for-data-collection/ (last visited June 30, 2023).

[79] Complaint For Civil Penalties, Injunction, And Other Relief, United States v. Facebook, Inc., Case No. 19-cv-2184-TJK (D.C. July 24, 2019), ECF No. 1.

43

only able to access data which they needed to operate, when in reality, the third-party apps could access nearly all of Facebook's users' personal data. The Chairman of the FTC, Jon Leibowitz, warned that "Facebook is obligated to keep the promises about privacy that it makes to its hundreds of millions of users . . . Facebook's innovation does not have to come at the expense of consumer privacy."[80]

143.  The 2011 FTC settlement resulted in a Consent Order which prohibited Facebook from misrepresenting the level of control consumer have over their privacy settlings, the necessary actions consumers need to take to exercise those controls, and the extent to which Facebook allows third-parties to access user information.[81]

144.  Another Facebook privacy scandal arose in April of 2015 when a report showed that Facebook could not track how many developers were using previously downloaded Facebook user information.

145.  In 2018, Meta faced scrutiny once more due to its failure to safeguard users' privacy. During congressional hearings, Facebook disclosed that a company named Cambridge Analytica potentially obtained the data of approximately 87 million users in relation to the 2016 presidential election. Consequently, the Federal Trade Commission (FTC) launched another investigation in 2019 to examine Facebook data collection methods and privacy policies. The investigation concluded with a historic settlement of five billion dollars.

146.  Thereafter, an investigation uncovered that Facebook had breached users' privacy consent by granting more than 150 companies access to users' information.[82] As a

---

[80] *Id.*

[81] Fed. Trade Comm'n., In re Facebook, Decision and Order, FTC File No. 092 3184 (Jul. 27, 2012).

[82] Elizabeth Schulze, *Facebook let tons of companies get info about you, including Amazon, Netflix, and Microsoft*, CNBC (Dec. 19, 2018), https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html (last visited June 30, 2023).

result, certain companies even had the ability to read users' private messages. Paradoxically, this arrangement assisted Meta in attracting a larger user base.

147.    In June 2020, despite assuring users that app developers would not be able to access their data if they had been inactive for 90 days, Facebook disclosed that it had still allowed third-party developers to retrieve such data.[83] As a consequence of their failure to safeguard user data, thousands of developers were able to view information about inactive Facebook users, provided that those users were connected on Facebook with an active user.

148.    Finally, in June 2022, a settlement was reached between Facebook and the U.S. Department of Justice regarding allegations that the company enabled landlords to engage in discriminatory practices when advertising housing through Meta's ad targeting tool called "Lookalike Audiences." It was alleged that this tool facilitated targeting users based on sensitive characteristics such as race, gender, religion, and more. As a result of the settlement, Meta agreed to discontinue the use of this discriminatory targeting tool.

149.    In spite of Facebook's long history of grievous privacy violations, it continues to collect highly sensitive medical information without consent and in disregard to the privacy rights of its users, including Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

150.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States whose PHI was collected through Facebook's Pixel through the Website.

---

[83] Kurt Wagner And Bloomberg, *Facebook admits another blunder with user data*, FORTUNE (July 1, 2020), https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/ (last visited June 30, 2023).

**Arizona Subclass**: All natural persons in the Arizona whose PHI was collected through Facebook's Pixel through the Website.

151.    Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

152.    Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

153.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

154.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

155.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, were prospective PII Users and users of the Website, and used, a Website to assess a health condition and search for information related to a health condition, and had their PHI and PII collected and disclosed by Healthcare Defendant.

156.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel

who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

157.   <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

158.   <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      a.  Whether Healthcare Defendant unlawfully collected Plaintiffs' and Class Members' PHI;

      b.  Whether Healthcare Defendant unlawfully disclosed and continues to disclose the PHI of PII Users in violation of the Federal Wiretap Act;

      c.  Whether Healthcare Defendant's disclosures were committed knowingly, willfully, or intentionally;

      d.  Whether Healthcare Defendant disclosures of Plaintiffs' and Class Members' PHI was without consent or authorization;

      e.  Whether Facebook collected Plaintiffs' and Class Members' PHI;

      f.  Whether Facebook unlawfully intercepts the PHI of PII Users in violation of the Federal Wiretap Act;

      g.  Whether Facebook's interception was committed knowingly, willfully, or intentionally;

      h.   Whether Defendants' material omissions regarding the practices alleged herein constitute an unfair and/or deceptive practice under the Arizona Consumer Fraud Act; and,

      i.   Whether Defendants' have been unjustly enriched under Arizona common law and the extent of their enrichment.

159.   Information concerning Healthcare Defendant's data sharing practices, including with respect to the identities of prospective PII Users are available from Healthcare Defendant's or third-party records.

160.   Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

161.   The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

162.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

163.   Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

## COUNT I

## FIRST CLAIM FOR RELIEF

**Violation Common Law Invasion of Privacy – Intrusion Upon Seclusion**

**(On Behalf of Plaintiffs and the Nationwide Class)**

**Against Facebook**

164.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 163 as though fully set forth herein.

165.    Plaintiffs assert claims for intrusion upon seclusion and so pleads that: (1) Facebook intentionally intruded into a place, conversation, or matter as to which Plaintiffs and the Nationwide Class had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

166.    Facebook intentionally intruded upon Plaintiffs and Nationwide Class Members' seclusion through its interception and collection of communications transmitted between PII Users, including Plaintiffs and Class Members, and the Healthcare Defendant, including sensitive medical information, in the form of PHI, without obtaining consent or authorization for such disclosure from Plaintiffs and the Nationwide Class.

167.    Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy when they provided their sensitive medical information to Healthcare Defendant through their communications with Healthcare Defendant on the Website. Personal medical information is widely recognized by society as sensitive information that cannot be shared with third parties without the explicit consent. For example, public polling shows that, "[n]inety-seven percent of Americans believe that

doctors, hospitals, labs and health technology systems should not be allowed to share or sell their sensitive health information without consent."[84]

168.    Plaintiffs and Nationwide Class Members' reasonable expectation of privacy is supported by HIPPA's recognition that medical data is sensitive information that must be protected from unauthorized disclosure.

169.    Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy believing that Facebook would not disclose their communications with Healthcare Defendant as a medical provider, because Facebook affirmatively promised users that it would require its business partners to only share information with Facebook that could be lawfully shared.

170.    Plaintiffs and Nationwide Class Members possessed a reasonable expectation of privacy based on the belief that Facebook would abide by state criminal laws, such as the Federal Wiretap Act ("Wiretap Act") and HIPPA. The Wiretap Act prohibits Facebook from intercepting communications between patients, such as Plaintiffs and the Class, and their healthcare providers without the consent of all parties involved in the communication (both the PII User and the healthcare provider).

171.    As explained above, Facebook's actions constitute a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

    a.    the invasion of privacy occurred in a highly sensitive setting – PII Users' communications with their healthcare provider;

    b.    Facebook had no legitimate objective or motive in invading Plaintiffs' and Nationwide Class Members' privacy;

---

[84] *Poll: Huge majorities wants control over health info,* HEALTHCARE FINANCE, https://www.healthcarefinancenews.com/news/poll-huge-majorities-want-control-over-health-info (last visited June 30, 2023).

c.   Facebook violated multiple laws by invading Plaintiffs' and Nationwide Class Members' privacy, including the Wiretap Act;

d.   Facebook deprived Plaintiffs and Nationwide Class Members of the ability to control dissemination of their personal medical information; and

e.   Facebook's actions are also unacceptable as a matter of public policy because they undermine the relationship between patients and their healthcare providers.

172.   Facebook's interception and collection of Plaintiffs and Nationwide Class members' communications with Healthcare Defendant is also so pervasive and extensive as to constitute oppression, malice, or fraud.

173.   As a direct and proximate result of this infringement upon their privacy, Plaintiffs and Nationwide Class Members sustained harm and experienced various damages. In light of these injuries, Plaintiffs and Nationwide Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

<u>**COUNT II**</u>

**Violation Common Law Invasion of Privacy – Intrusion Upon Seclusion**

**(On Behalf of Plaintiffs and the Nationwide Class)**

**Against Healthcare Defendant**

174.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 173 as though fully set forth herein.

175.   Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy in their communications with Healthcare Defendant via its Website. Medical data is widely recognized by society as sensitive information that cannot be shared with third parties without the PII Users' explicit consent. For example, public polling shows that, "[n]inety-seven percent of Americans believe that doctors, hospitals, labs and health

technology systems should not be allowed to share or sell their sensitive health information without consent."[85]

176.    Plaintiffs' and Nationwide Class Members' reasonable expectation of privacy is supported by HIPPA's recognition that patient medical data is sensitive information that must be protected from unauthorized disclosure.

177.    Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy believing that Healthcare Defendant would not their personal communications with Healthcare Defendant, as a medical provider, because Healthcare Defendant was under a duty to not share such information with Facebook unless it had explicit authorization to do so.

178.    Plaintiffs and Nationwide Class Members possessed a reasonable expectation of privacy based on the belief that Facebook would abide by state criminal laws, such as the Federal Wiretap Act ("Wiretap Act") and HIPPA. The Wiretap Act prohibits Facebook from intercepting communications between patients, such as Plaintiffs and the Class, and their healthcare providers without the consent of all parties involved in the communication (both the PII User and the healthcare provider). Through its placement of the Facebook Pixel on the Website, Healthcare Defendant enabled this interception and resulting intrusion upon Plaintiffs' and Nationwide Class Members' privacy.

179.    As explained above, Healthcare Defendant's actions constitute a serious invasion of privacy that was egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

    a.    the invasion of privacy occurred in a highly sensitive setting – PII Users' communications with their healthcare provider;

---

[85] *Poll: Huge majorities wants control over health info,* HEALTHCARE FINANCE, https://www.healthcarefinancenews.com/news/poll-huge-majorities-want-control-over-health-info (last visited June 30, 2023).

b.     Healthcare Defendant had no legitimate objective or motive in invading Plaintiffs' and Class Members' privacy in such a manner;

c.     Healthcare Defendant violated multiple laws by invading Plaintiffs' and Nationwide Class Members' privacy including the Wiretap Act and HIPPA;

d.     Healthcare Defendant deprived Plaintiffs and Nationwide Class Members of the ability to control dissemination of their personal medical information;

e.     Healthcare Defendant's actions are also unacceptable as a matter of public policy because they undermine the relationship between patients and their healthcare providers; and

f.     Whether Facebook was unjustly enriched.

180.   Healthcare Defendant's transmission of Plaintiffs' and Nationwide Class Members' communications with Healthcare Defendant is also so extensive as to constitute oppression, malice, or fraud.

181.   As a direct and proximate result of this infringement upon their privacy, Plaintiffs and Nationwide Class Members sustained harm and experienced various damages. In light of this injury, Plaintiffs and Nationwide Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

## COUNT III

### VIOLATION OF THE FEDERAL WIRETAP ACT

### 18 U.S.C. § 2510, et. seq. (On Behalf of Plaintiffs and the Nationwide Class)

### Against Facebook

182.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 181 as though fully set forth herein.

183.   Plaintiffs bring this claim individually and on behalf of the members of the proposed class against Facebook and Healthcare Defendant.

184.   Codified under 18 U.S.C. U.S.C. §§ 2510 et seq., the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

185.   The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

186.   The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

187.   The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

188.   The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

189.   The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in

54

whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

190.    Facebook is a person under the Wiretap Act.

191.    The Facebook Pixel constitutes a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

192.    The confidential communications between Plaintiffs and the Nationwide Class and Healthcare Defendant's Website, in the form of their PHI were intercepted by Facebook utilizing the Facebook Pixel, and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

193.    The Wiretap Act is applicable to both the sending and receipt of communications.

194.    Plaintiffs and the Nationwide Class had a reasonable expectation of privacy in their electronic communications with the Healthcare Defendant's Website in the form of their PHI. Interception of Plaintiffs and Nationwide Class Members' communications with the Healthcare Defendant's Website occurs in the regular course of using the Healthcare Defendant's Website to search for information related to health conditions and assess health conditions. Moreover, Facebook is not a party to these communications.

195.    Facebook violated the Wiretap Act by utilizing the communications that they intercepted to create target audiences and lookalike audiences. 18 U.S.C. § 2511(1)(c).

196.    Facebook's interception and use of Plaintiffs' and Nationwide Class Members' communications that they had with their health care provider, Healthcare Defendant, was intentional and knowing as indicated by: (a) Facebook's promotion of its Facebook Pixel to healthcare providers, such as Healthcare Defendant, for use on their websites; (b) Facebook's promotion that utilizing the Facebook Pixel on the healthcare providers websites would allow them to create custom audiences; and (c) Facebook's

failure to prevent health care providers from transmitting personal medical data to Facebook using the Facebook Pixel.

197. Facebook's interception of these communications occurred contemporaneously with Plaintiffs and Class Members sending and receiving those communications.

198. The intercepted communications, in the form of PHI, between Plaintiffs, the Nationwide Class Members, and the Website constitute the "contents" of the communications for purposes of the Wiretap Act.

199. Facebook did not receive consent from Plaintiffs or the Nationwide Class before it intercepted, disclosed, and used their sensitive PHI with Healthcare Defendant. Indeed, such consent could not have been given as neither Facebook nor Healthcare Defendant ever sought any form of consent from Plaintiffs or the Nationwide Class to intercept, record, and disclose their private communications with the Healthcare Defendant's Website.

200. As detailed above, Facebook's unauthorized interception, disclosure and use of Plaintiffs' and the Nationwide Class Members' PHI was only possible through Facebook's knowing, willful, or intentional placement of the Facebook Pixel on the Website. 18 U.S. Code § 2511(1)(a).

201. Plaintiffs and the Nationwide Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications Facebook in violation of 18 U.S.C. § 2520. As such, Plaintiffs and the Nationwide Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nationwide Class and any profits made by Facebook as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate

equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT VI

### Violation of Arizona Consumer Fraud Act

### A.R.S. §44-1521 et seq.

### (On Behalf of Plaintiff Alicia Bell and the Arizona Subclass)

### Against Healthcare Defendant

202. Plaintiff, Alicia Bell, incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 202 as though fully set forth herein.

203. The Arizona's Consumer Fraud Act A.R.S. 44-1521 et seq, makes it illegal to engage in deceptive acts or practices in the conduct of any business, trade, or commerce, or in furnishing of any service in the state of Arizona.

204. A.R.S. § 44-1522 states that:

> (a) The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

205. Through Healthcare Defendant's act or practices alleged herein, including the use of health assessments in connection with the promotion of their medical services, Healthcare Defendant was selling or advertising merchandise as those terms are defined in A.R.S. § 44- 1521.

206. Healthcare Defendant's acts and practices were unfair and deceptive in and from Arizona, in violation of the Arizona Consumer Fraud, specifically through:

a. Healthcare Defendant's promise to keep Plaintiff's and Arizona Subclass Members' PHI private as required by law;

b. implementing the Facebook Pixel on their Website to which resulted in the transmission of Plaintiff's and Arizona Subclass Members' PHI to Facebook without their authorization;

c. their failure to disclose material facts regarding disclosure of Plaintiff's and Arizona Subclass Members' PHI to Facebook;

d. their failure to take proper steps to ensure the Facebook Pixel would not result in the unauthorized disclosure of Plaintiff's and Arizona Subclass Members' PHI to Facebook;

e. their unlawful disclosure of Plaintiff's and Arizona Subclass Members' PHI to Facebook;

f. deceptively representing to Plaintiff and Arizona Subclass Members that the Website did not have the Facebook Pixel active, when it did.

207.   Healthcare Defendant knew or should have known that is act and practices were in the nature of those prohibited by A.R.S. § 44-1522, et seq.

208.   Healthcare Defendant's acts and practices were deceptive and unfair because Healthcare Defendant intended Plaintiff Bell and Arizona Subclass Members to rely on those acts and practices their concealment and omission of material facts in connection with their offering of goods, merchandise and services.

209.   In particular, Healthcare Defendant had knowledge that Plaintiff Bell and Arizona Subclass Members placed their trust and reliance on it as a healthcare provider to maintain the privacy of their communications with the Website.

210.   Despite its obligation as a healthcare provider and its explicit assurance of confidentiality, Healthcare Defendant utilized the Pixel to expose and transmit the PHI of Plaintiff Bell and Arizona Subclass Members to third parties, specifically Facebook.

211. Healthcare Defendant's disclosures were made without Plaintiff Bell and Arizona Subclass Members' knowledge, consent, or authorization, and thus were unprivileged.

212. This breach of confidence caused harm in the form of eroding the essential confidential relationship between healthcare providers and patients, that ensures the protection of confidential medical information.

213. Healthcare Defendant's acts were made knowingly, intentionally, and voluntarily, as it was aware of the Pixel's purpose and functionality, and it utilized the benefits that the Pixel provided to the detriment of Plaintiff Bell and Arizona Subclass Members' protected interests.

214. Plaintiff Bell and Arizona Subclass Members had no way of avoiding the harms described herein through the exercise of ordinary diligence.

215. Healthcare Defendant maintained a duty to disclose the material information that the PHI of Plaintiff and Arizona Subclass Members was being shared with a third-party, including because: (1) Healthcare Defendant had superior knowledge regarding these disclosers, and Plaintiff and Arizona Subclass Members had no other way to obtain such information; (2) due to the nature of the special relationship between Healthcare Defendant, and Plaintiff and Arizona Subclass Members, as a healthcare provider, Healthcare Defendant had a duty to keep their sensitive medical information, including their PHI, completely confidential; (3) the omitted facts relate to the health and safety of Plaintiff Bell and the Arizona Subclass Members; (4) Healthcare Defendant made affirmative statements regarding the confidentiality of sensitive medical information, but failed to disclose all material facts (including that it was sharing PHI with third-parties) making its partial disclosures, misleading, confusing, and deceptive to a reasonable consumers in the Arizona Subclass.

216.    Due to the aforementioned actions taken by Healthcare Defendant, Plaintiff Bell and the Arizona Subclass Members have suffered harm and injury.

217.    Healthcare Defendant's unlawful conduct is ongoing and continuing. Therefore, injunctive and declaratory relief is necessary and appropriate to prevent further violations of Plaintiff Bell and Arizona Subclass member's privacy rights.

218.    As a direct and proximate results of Healthcare Defendant's invasion of their privacy rights, Plaintiff and Arizona Subclass Members are entitled to just compensation including monetary damages.

219.    Plaintiff Bell and the Arizona Subclass Members seek relief for these injuries, including damages that will reasonably compensate Plaintiff Bell and Arizona Subclass Members for harm to their protected privacy interests resulting from Healthcare Defendant's violations of the Arizona Consumer Fraud Act.

220.    Plaintiff Bell and Arizona Subclass Members seek all relief available under A.R.S. §44-1521 et seq., including injunctive relief.

**COUNT VII**

**Unjust Enrichment**

**(On Behalf of Plaintiffs and the Nationwide Class)**

**Against Meta**

221.    In the alternative to the claims alleged above, Plaintiffs incorporate by reference and re-allege each and every fact allegation set forth above in paragraphs 1 through 221 as though fully set forth herein.

222.    Facebook has received benefit from unlawfully intercepting Plaintiffs' and Class Members' PHI and has unjustly retained those benefits at the expense of Plaintiffs and Class Members. As discussed above, the value of Plaintiffs' and Class Members' PHI can be put in monetary terms, and the sensitivity of such information further increases the value of that information.

223.    Plaintiffs and Class Members conferred to Facebook benefit in the form of valuable PHI that Facebook collected from Plaintiffs and the Class, without authorization and proper compensation. Facebook collected this information for its own profit, providing Facebook with economic, intangible, and other benefits, including the substantial monetary benefits Facebook gains from third parties who utilize Facebook's advertising services.

224.    Facebook has unjustly retained the aforementioned benefits, as Facebook's conduct damages Plaintiffs and Class Members, without providing any compensation commensurate with the benefits derived from Plaintiffs and Class Members.

225.    Facebook derived benefits from Plaintiffs and Class Members that belonged to Plaintiff and Class Members. Allowing Facebook to retain those benefits would be inequitable under unjust enrichment principles in Arizona, Washington, and every other state in which Facebook operated. Facebook derived such benefits from the unfair unconscionable methods, acts, and trade practices alleged in this Complaint.

226. As such, Facebook should be required to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Facebook received, and other such relief that the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of their respective classes and their counsel as Class Counsel;

(b) For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Pixel from the Website or (ii) add, and obtain, the appropriate consent from PII Users;

(e) For damages in amounts to be determined by the Court and/or jury;

(f) An award of statutory damages or penalties to the extent available;

(g) For pre-judgment interest on all amounts awarded;

(h) For an order of restitution and all other forms of monetary relief;

(i) An award of all reasonable attorneys' fees and costs; and

(j) Such other and further relief as the Court deems necessary and appropriate.

1  DATE: July 3, 2023                    Respectfully submitted,

2

3                                        **GALLAGHER & KENNEDY, P.A.**

4                                        */s/ William F. King*
                                         Kevin D. Neal
5                                        William F. King
                                         Kenneth N. Ralston
6                                        2575 East Camelback Road
                                         Phoenix, Arizona 85016-9225
7                                        *Attorneys for Plaintiff*

8

9                                        **LEVI & KORSINSKY, LLP**
                                         Mark S. Reich*
10                                       55 Broadway, 4th Floor, Suite 427
                                         New York, NY 10006
11                                       Telephone: (212) 363-7500
                                         Facsimile: (212) 363-7171
12                                       Email: mreich@zlk.com

13

14                                       *Attorneys for Plaintiffs*

15                                       **pro hac vice* forthcoming

16

     *9577515v1 / new*
17

18

19

20

21

22

23

24

25

26

27
                                                  63
28